## J. BRITAIN WINTER *v.* MARY F. HARRINGTON O'NEILL.
[No. 22, April Term, 1928.]

*Decided May 25th, 1928.*

626

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*J. Britain Winter,* with whom was *Edward A. Strauff* on the brief, for the appellant.

*Seymour O'Brien,* with whom was *William J. O'Brien* on the brief, for the appellee.

DIGGES, J., delivered the opinion of the Court.

The case presented by this appeal involves the question of title to a parcel of land located on Montpelier Street, between Taylor and Adams Streets, in Baltimore City. William J. O'Brien, agent for the appellee, on August 19th, 1924, entered into an agreement with the appellant, by which the appellee agreed to sell and the appellant agreed to purchase the land in question. This agreement was in writing, O'Brien, agent for Mrs. O'Neill, being party of the first part, and Winter party of the second part, and provided:

"That the said party of the first part does hereby bargain and sell unto the said party of the second part, and the latter doth hereby purchase from the former the following described property, situate and lying in Baltimore City, on the southwest side of Montpelier Street, approximately 225 feet northwesterly from Taylor Street, lot approximately 79 feet 6 inches on Montpelier Street by ninety feet deep. At and for the price of one thousand dollars, of which one hundred dollars have been paid prior to the signing hereof and the balance to be paid as follows: Cash within thirty days from the date of this agreement. And upon payment as above of the unpaid purchase money, a deed for the property shall be executed at the vendee's expense by the vendor, which shall convey the property by a good and merchantable title to the vendee. Taxes and all other expenses to be paid

or allowed for by the vendor to date of transfer. Time
is the essence of this contract."

The time for the completion of the contract was extended by agreement, so that this question does not enter into consideration. Upon the examination of the title by the appellant, he ascertained what he believed to be defects therein which would prevent his obtaining a good and merchantable title, and for this reason he refused to comply with the terms of his agreement. Whereupon the appellee filed a bill in the Circuit Court of Baltimore City, setting forth the contract of sale and praying that it might be specifically enforced. The chancellor, after a hearing of the case, decreed that the appellant should specifically perform the covenants, conditions, and agreements of the contract, and upon such performance the appellee should deliver to him a good and sufficient deed for the property mentioned and described in the contract. It is from that decree this appeal is prosecuted.

By the terms of the contract the appellee agreed to convey a good and merchantable title, and if she is unable to do this, the appellant cannot be required to perform his agreement in respect to the purchase. The appellee's title rests upon a tax sale made by the city collector on December 14th, 1915, at which sale John O'Neill, the husband of the appellee, became the purchaser at and for the sum of $106, he subsequently devising the same to the appellee by his last will and testament. It therefore appears that if the tax sale included the property covered by the contract, and was valid in all other respects, the appellee has a good and merchantable title, which the appellant is bound to take, and he expresses his willingness and readiness to take the property if the title be as described in the contract. There is some contention made that the purchase price at the tax sale is grossly inadequate, the property being assessed for $1,060 and the price being $106. Gross inadequacy is not shown, for the reason that, at the time the property was assessed, a number of years before the sale, the property was improved by a dwelling house, which at the time of the sale had been destroyed. There is

no evidence as to the value of this house, but we must assume that it had substantial value, and upon its destruction the value of the total property would be decreased by that amount; and we find no such discrepancy as would require a court of equity to set the sale aside on that ground.

At one time this property was in Baltimore County and was a portion of the tract or subdivision known as "Homestead," a plat being filed among the land records of that county. On this plat, fronting on Montpelier Street, between Adams and Taylor, there appear to have been originally laid out 31 lots, numbered on the plat from 1044 to 1074, inclusive, each fronting on Montpelier (then Madison) Street 16 feet, and running a distance of 90 feet to an alley, the lots being rectangular in shape, 16 by 90 feet. The property covered by the contract is a piece of land fronting approximately 79 feet 6 inches on Montpelier Street by 90 feet deep, and includes what were on the old plat five lots numbered on that plat from 1056 to 1060, inclusive. In 1852 all of the lots shown on the plat, fronting on Montpelier Street between Taylor and Adams, were owned by Robert Gorsuch, who in that year conveyed by deed to Col. William Stansbury lots 1045 to 1060, inclusive. This deed embraces the land now in question. On May 12th, 1855, Col. William Stansbury conveyed to Dr. Washington Stansbury certain lots in this block of "Homestead," including numbers 1056, 1059 and 1060, but not including lots Nos. 1057 and 1058. In 1870 Dr. Washington Stansbury leased to John W. Bamberger lots 1056, 1059, and 1060. On May 19th, 1866, the fee of lots 1056 and 1057 was conveyed by James F. Purvis to Bamberger; so that, after the lease of 1870 to Bamberger, he held fee simple title to lots 1056 and 1057 and owned the leasehold interest in lots 1059 and 1060. As stated, the land hereby contracted to be sold contained five lots, and lot 1058, which Bamberger appears not to have had a record title to, was in the center of the tract, two of the lots, to wit, 1056 and 1057, being on one side, and 1059 and 1060 on the other. The record further discloses that Bamberger lived on this

property, rented it to tenants or occupied it, as one entire lot, from at least 1883 until his death; and it was continued to be rented or used by some of his children up until a few years before the tax sale; and there is no evidence that the use and occupation by Bamberger was not such as described from 1870 on.

When the territory in which this land is located was taken into Baltimore City, what were the five lots as described on the "Homestead" plat were assessed on the tax books of the city as one lot, described as lot No. 4300-A in the name of John W. Bamberger, and also in the deed from the collector to John O'Neill as property situated on the south side of Montpelier Street beginning 225 feet northwesterly from Taylor Street and running northwesterly 79 feet 6 inches with a depth of 90 feet. At the time the tax sale was made the lot was vacant, Bamberger being then dead, and the collector, by the exercise of due diligence, was unable to find the owner of the property or his, her, or their agent or representative. No such owner or representative having been found in the city, and neither the residence, usual place of abode, or last residence of such being known within the city, a bill, setting forth the amount of the taxes due on the property and specifying the year or years for which they were due, was set up on the premises 30 days prior to the sale. Section 43 of the codification of the Baltimore City Charter, 1927, among other things provides:

> "The city collector shall, before advertising said property for sale, give to the person or persons so in arrears, or to one of them, if more than one, or leave at his or her or their residence, or last known residence of one of them, and if no such residence be known, there shall be left upon the premises so to be sold for taxes, a statement of his or her or their indebtedness, and not less than thirty days' notice of his (said collector's) intention, if the bill is not paid, to enforce the payment thereof by distraint or execution. * * * Said notice shall state the name of the person or per-

sons last assessed for the taxes levied, the amount of taxes due on the same, and a description giving street number of the improvement, and giving with substantial accuracy the frontage and depth of the lot."

It is clear that the provisions of the statute were followed by the collector in this sale. The notice contained the name of the last owner to whom the property was assessed, its street number, and gave with substantial accuracy the frontage and depth of the property. This notice, the collector being unable to find the owner or his agent or representative within the city, was set up on the the property described in the assessment and in the notice. It is objected that the evidence does not show that this notice was set up on that portion of the described property which formerly was lot 1058 on the old plat of "Homestead," and that, Bamberger not having a record title to that lot, either fee or leasehold, it must appear that the notice was set up on that particular lot.

The appellee asserts that there was a mistake in the numbering of the lots in the lease to Bamberger in 1870, arguing in support of this that there is a strong inference, because of the fact that, if the record is not a mistake, Bamberger in 1870 would have acquired a leasehold interest in lot 1057, a lot to which he had a fee simple title by the deed from Purvis in 1866. There is some force in the appellee's argument as to this inference, but we do not feel justified in reliance upon such inference. If in reality lot 1058 was never conveyed or leased to Bamberger, the record title would still remain in Dr. Washington Stansbury, his heirs or devisees. Even if this be true, a parcel of ground described as an entire lot, which embraced old lot 1058, was assessed as an entire lot in the name of John W. Bamberger, and when the city tax authorities proceeded to collect the state and county taxes, upon default in their payment, under the terms of the statute, in case the owner or his representative could not be found, it was only necessary to set up the notice on some portion of the land so assessed.

The title derived from a tax sale is statutory, and it being in derogation of a common right, all of the requirements as set out in the statute must be complied with, in order to acquire a good title from such a sale; yet if the tax deed and the proceedings upon which it is based are valid, then from the time of its delivery it clothes the purchaser not merely with the title of the person who had been assessed for the taxes and had neglected to pay them, but with a new and complete title in the land, under an independent grant from the sovereign authority, which bars or extinguishes all prior titles and encumbrances of private persons, and all equities arising out of them. *Textor v. Shipley,* 86 Md. 434; *Hefner v. Northwestern Ins. Co.,* 123 U. S. 751; *McMahon v. Crean,* 109 Md. 652; *Hill v. Williams,* 104 Md. 604; *Wagner v. Goodrich,* 148 Md. 318. It requires no argument to demonstrate that, when a governmental agency is empowered to levy taxes for the purpose of producing revenue for the support of the government, it is necessary that a method be provided by which the payment thereof may be enforced. When this method is sale at public auction to the highest bidder, it is essential, in order that there may be bidders at such sale, that the purchaser's title be protected, in cases where the statutory essentials of the sale are substantially complied with; otherwise the collection of taxes would be seriously impaired. In *Hill v. Williams, supra,* it is said: "It is not compatible with public convenience and the prompt collection of revenue for the State to trace out all the subdivided or qualified interests that may be held in real estate, and seek to hold the various owners responsible. Its policy is to assess the fee simple value of the land to the holder of the possession, where its real owner is not apparent or accessible, leaving the parties interested to adjust the proportions of liability between themselves." *Baltimore v. Canton Co.,* 63 Md. 218.

The contention is also made by the appellant that the tax sale was improper in that the collector should have sold only a part of the lot to satisfy the claim. This question

was very recently passed upon by this court in *Riverdale Church v. Pugh & Co.*, 154 Md. 550. In that case Judge Offutt, speaking for the court, said: "It was the duty of the treasurer to sell no more property than was reasonably necessary to pay the taxes and charges on the land, where it was divisible without loss. *Margraff v. Cunningham*, 57 Md. 585. Appellant contends, however, that *Textor v. Shipley*, 86 Md. 442, modified the rule stated in the last cited case, and held it did not apply to city lots. But that case did not hold that the rule stated in *Margraff v. Cunningham, supra*, did not apply to city lots, but that it did not apply to a small city lot. And the same reason which would make it improper to sell several parcels of land in the country to pay a tax bill for which the sale of one would suffice, would make it improper to sell a number of city lots to pay a bill for which the sale of one would be sufficient. In this case, if the jury found, as the prayer required them to do, that the property consisted of two lots, separately numbered, and that together they were worth $1,000, it may fairly be inferred that they could have been sold separately without loss and that the sale of one of them would have produced a fund sufficient to pay a bill amounting to $10.63 for taxes, interest, penalties, and costs. Under such circumstances it was the plain duty of the treasurer to have offered the lots separately, and not to have offered them together until he had failed to secure a bid on either of them sufficient to have paid the taxes, interest, penalties, and costs, payable out of the whole property, and his failure to follow that course was sufficient in itself to invalidate the sale. *Cooley on Taxation*, par. 1430."

The effect of this decision was to hold that the principle enunciated by our predecessors in *Margraff v. Cunningham, supra*, and *Dyer v. Bosley*, 39 Md. 471, was not modified by *Textor v. Shipley, supra*, and that the decision in the last mentioned case simply held the principle not applicable to a small city lot. The facts in the case just quoted were essentially different from those in the one now being considered. There the property sold was described as being lots

17 and 18 of block 34 in the town of Riverdale, assessed at $600; the taxes due amounted to $10.63, and the property was admittedly of the value of $1,000. The purchaser paid therefor at the tax sale $10.63. From the assessment in that case, it would have been entirely practicable and convenient to offer one of the lots instead of both together, and it can hardly be doubted that, if this had been done, the single lot offered would have sold for at least $10.63, the amount necessary to pay the taxes, interest, and costs. The description also referred to a plat showing, as well as the advertisement itself, that there were two separate and distinct lots, easy of ascertainment and definement. The record in the case now under consideration shows that the only indication that the property sold was ever divided into lots was the old "Homestead" plat, recorded a great many years ago in Baltimore County, at a time when the property was within the county limits; that it has always been assessed as one entire lot, from the time it was taken into the city, described as beginning 225 feet from Taylor Street and fronting 79 feet 6 inches on Montpelier Street. The taxes in arrears amounted to $54.02, to which must have been added interest and costs. The property was sold for $106. As stated, it was assessed some years before the sale, at which time there was a house upon it, for $1,060. The house had been destroyed at the time of the sale. The land is located in Baltimore City, but in 1915 was in the outlying districts; and there is no evidence which discloses that the amount it brought at the tax sale in 1915 was an inadequate price for that acreage in that locality at the time of the sale. More than twelve years have elapsed since the sale, in which the purchaser at that sale, and those claiming under him, have been in undisputed possession and quiet enjoyment of the property. The objection now being made is not by any person claiming under owners prior to the tax sale, but by one who contracted to buy from the appellee, who claimed under the tax sale. We do not desire to be understood as modifying the decision in *Riverdale Church v. Pugh & Co., supra,* but are of the opinion

that the facts of the present case so clearly distinguish it as to render the principle there announced inapplicable to the case before us.

Finally the contention is made that the tax sale was not advertised for the proper length of time. Counsel for both sides have stipulated, among other things, as follows: "It is agreed that the property described in the levy was properly advertised in the Baltimore American, the German Correspondent and the Municipal Journal as per certificates of publication duly filed." The appellee contends that this stipulation debars the appellant from making the contention that the advertisement of sale was not for the proper length of time. As to the effect of the stipulation, we cannot agree with the appellee's contention. The proceeding being statutory, the requirements of the statute are mandatory and not directory, and must be followed to make the sale valid. Counsel cannot stipulate that an advertisement of a tax sale, not in compliance with the statutory requirements, is a proper advertisement. The objection to the advertisement here urged is the length of notice which it gave. The requirement of the statute (section 43 of the Baltimore City Code, 1927) in force at the time this advertisement was published, is that the collector give notice of the tax sale by advertisement published once a week for four successive weeks in two of the daily newspapers published in Baltimore City, and in every issue of the Municipal Journal during said four weeks. The first publication here was made November 16th, 1915, and the day of sale was December 14, 1915. It therefore appears that, in order to give four full weeks' notice, either the day of the first publication or the day of sale must be included. In the case of *Walsh v. Boyle,* 30 Md. 262, it was said: "It has also been held that a statute requiring fourteen days *at least* means fourteen clear days, and the same rule must be adopted. *Queen v. Justices of Shropshire,* 8 Ad. & El. 173; *Oliver v. Towns,* 1 Texas (no such case in 1 Texas), relied on by the appellees. But we take the law to be well settled, however, in matters of practice, where any particular number of

days, not expressed to be *clear days,* is prescribed, the rule in regard to computation of time is not to exclude both the day on which the notice is served and the day on which the act is to be performed, but to include the one and exclude the other." And in *Graham v. Wellington,* 121 Md. 660, this court, speaking through Chief Judge Boyd, in construing the election law requiring that certificates of nomination should be filed not less than twenty-five days before the election, said: "It will not be amiss, however, to call attention to the terms of the statute, which are, 'not less than twenty-five days before the day of election.' While the general rule in the computation of time is to include one day and exclude the other, and not to include or exclude both, there are many decisions which hold that if the statute indicates that there are to be so many clear days, or that requires so many days *at least,* both are to be excluded."

The effect of these decisions is to adopt the general rule, as there stated, that in the computation of time, where there is no language indicating that the notice shall be so much clear time, or at least so many days, weeks or months, the rule is not to include or exclude both the day of first publication and the day of sale, but to include one and exclude the other. Applying this general rule to the case before us, we find that, if the day of the first publication or the day of sale either is excluded, and the other included, there will remain twenty-eight days' or four weeks' notice, which is all that the statute requires. See also *Texlor v. Shipley, supra.* In the case of *Owens v. Graetzel,* 146 Md. 361, both days were excluded, as was done in *Walsh v. Boyle, supra; Steuart v. Myers,* 54 Md. 455, and *Graham v. Wellington, supra;* but this for the reason that the requirement of the statute in those cases indicated that the notice should be so much clear time, such as "at least three weeks," and "not less than twenty-five days." The notice required in the case of *Byrd v. Day,* 138 Md. 442, relied upon by the appellant, was similar to that in this case, but a computation of the time between the day of the first publication and the day of sale showed it to be only twenty-four days, applying the general rule of includ-

636

ing one and excluding the other, and falling far short of the four weeks required by the statute. In *Textor v. Shipley, supra,* in which the court was construing the identical statute now under consideration, it was stated that the requirement of a strict compliance with the statute was met by notice of twenty-eight days or four weeks, arrived at by including the day of publication of the first notice and excluding the day of sale.

There being no error, the decree of the lower court will be affirmed.

*Decree affirmed, with costs to the appellee.*