KOCH ET AL. INDIVIDUALLY AND TRADING AS RANDALL MOTORS ET AL. *v.* MACK INTERNATIONAL MOTOR TRUCK CORPORATION ET AL.

[No. 75, October Term, 1952.]

*Decided March 12, 1953.*

*Motion for rehearing or modification, filed April 9, 1953, denied April 22, 1953.*

564

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS and HENDERSON, JJ.

*Alexander Stark,* for appellants.

*Jack L. Hardwick* and *Benjamin A. Earnshaw,* with whom were *Carmody and Earnshaw,* on the brief for Mack International Truck Corporation and James V. Kelly, appellees.

*J. Edgar Harvey,* Deputy Attorney General, for Police Commissioner of Baltimore City and Commissioner of Motor Vehicles.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in a replevin case by the trial judge, sitting without a jury.

On January 16, 1952, one of the plaintiffs and one of the appellees here, Mack International Motor Truck Corporation, hereinafter referred to as Mack, filed a suit in replevin against the defendants, George J. Koch and Albert C. Smith, co-partners, trading as Randall Motors, hereinafter referred to as Randall Motors; Beverly Ober, Police Commissioner of Baltimore City, hereinafter referred to as the Police Commissioner; and Thomas B. R. Mudd, Commissioner of Motor Vehicles for the State of Maryland, hereinafter referred to as the Commissioner of Motor Vehicles; alleging that they "seized and took the goods and chattels of the said plain-

tiff to wit": a tractor truck described therein, of the value of $9,000.00, which they had unjustly detained. Mack filed the same day a petition in which it alleged among other things, that it was the "lien holder" of the tractor truck, and J. V. Kelly was the owner thereof, and that the defendants were preparing to sell or otherwise dispose of said chattel in violation of the rights of the petitioner. It asked that the defendants be enjoined from selling or disposing of the tractor truck until after a hearing and final decision in the replevin action. Apparently no action was taken by the trial judge on this petition. After the filing of this petition by Mack a demurrer was filed to the *narr* in replevin and to the petition by Randall Motors on the grounds, among others, that Mack did not disclose its true interest in the tractor truck and "that there is a non-joinder of a proper party plaintiff, in that the proper party plaintiff would be 'the owner, J. V. Kelly' ". That demurrer was overruled. James V. Kelly then filed a petition alleging that he had an interest in the tractor truck and asked that he be joined as a party plaintiff. An order was signed adding James V. Kelly as a party plaintiff. No demurrer was filed to the amended *narr* and general issue pleas were filed by all the defendants. Motions for summary judgments were filed by the Police Commissioner and Commissioner of Motor Vehicles. No action was taken by the trial judge on the motions for summary judgments. After interrogatories were filed and answered by the various parties, a hearing was held before the trial judge. From a judgment in favor of the plaintiffs for the property replevied, valued at $7,000.00, and one cent damages, and in favor of the Police Commissioner and the Commissioner of Motor Vehicles for costs, Randall Motors appeals here.

The pertinent testimony follows. Mr. James V. Kelly of Kansas City, Missouri, by deposition and by testimony in open court said that on June 27, 1950, he purchased a new Mack tractor truck from Mack, appellee here, and received from it a bill of sale. Mr. Kelly admitted that

he did not get a certificate of title and license tags for the new truck because he wished to avoid paying the Missouri sales tax of $600.00. On the same day he executed to Mack a chattel mortgage on the truck in the amount of $9,200.33, being the balance of the purchase price. It was proven that the chattel mortgage was recorded on the day of the sale in Jackson County, Missouri, and that Mack satisfied the requirements of the recordation statute. The chattel mortgage was admitted in evidence. Kelly admitted that the tractor truck was not titled in any State with the Commission of Motor Vehicles. An Alabama license tag was issued for this truck in 1950, but apparently was never used. Kelly employed Sam Schooling to operate the truck. The trip when the truck was stolen was Schooling's first trip. The automobile plates used at the beginning of the trip in question, were issued to Mr. Kelly for use on another vehicle. However, when it was found by Mr. Schooling in Jersey City that these tags were not on the vehicle, he attached the plates which were in the cab of the tractor, which had been issued to Mr. Wally Weeks of Kansas City, Missouri. Mr. Kelly made his payments on the chattel mortgage up until the time the truck was stolen. On the windshield of the truck on this trip was the following sticker: "The Public Utilities Commission of Ohio Tax Receipt, Tractor, No. 42163, 1950-1951, Void after July 1st, 1951". Letters were produced in evidence to show that from this sticker the owner of the truck could have been easily determined. Under the seat of the truck was a "trip contract" showing the owner and operator of the truck. The photographer testified that on May 14, 1952, he photographed the sticker on the windshield of the truck and the papers under the seat in the truck. On the side of the truck the number of the chassis was stamped.

Samuel J. Schooling testified that in July, 1951, he was employed by Mr. James Kelly as a truck driver but was not employed by him at the time of the trial. He drove the truck to New York City and then to Chicago

and parked the truck on a parking lot. In Jersey City he put on the truck Missouri License Tag No. 271-508. He testified that the Ohio sticker aforesaid was then on the windshield. About two-thirty the next morning, July 24th, he went to the parking lot and found that the truck had been stolen. He called the Chicago police and made a detailed report of the stolen truck, showing the make, type, color, motor number and model. He also called Mr. Kelly in Kansas City and reported the loss to him.

Mr. Kelly reported the loss to his insurance company and gave to Mack a full report. Mack issued a special letter about the loss to all its agencies in the United States. On July 25, 1951, Officer Albert Mazeroff of the Baltimore City Police Department saw a Mack tractor truck stalled on the street and directed the driver to "drift" it around the corner and seek help. The driver of the truck did not reappear. On July 27, 1951, the officer had the tractor truck towed away by the Police Department as an abandoned vehicle. It then carried Missouri tags No. 271-508. The secretary to the Police Commissioner sent inquiries to the Missouri Department of Motor Vehicles, who replied they had no record of the vehicle. Sergeant Joseph R. Rice testified that the Auto Theft Squad of the Baltimore Police Department received no notification about this abandoned truck until November 8, 1951, although under normal circumstances when a motor vehicle is picked up as abandoned a report is given by the Police Department to the Auto Squad promptly. On November 9th, the Auto Squad received a teletype from the City of Chicago. Mr. Lawrence B. McLean, the district manager of Mack in Baltimore, testified that he was called on the day of the sale of the truck. When he learned the price for which it was sold he became suspicious and obtained the chassis number, which was stamped on the side of the truck. In fifteen minutes he found from Mack's record department that the truck had been stolen from James Kelly of Kansas City, Missouri.

On October 28, 1951, and again on November 5, 1951, the Baltimore Police Department advertised ·the tractor truck for sale in a daily newspaper in. Baltimore City and pursuant to the advertisement sold it on November 5, 1951, to Randall Motors, appellant, at public sale, as the highest bidder for the price of $1,925.00. The following day Randall Motors obtained a title from the Department of Motor Vehicles of Maryland for the truck. On November 9, 1951, four days after the sale, the Police Department of Baltimore notified Randall Motors that they had just received a report from Chicago that the truck had been stolen. On behalf of James Kelly a demand was made on Randall Motors for the return of the stolen tractor truck, and the return of the purchase price was tendered. Upon refusal of Randall Motors to return the vehicle the replevin suit was filed.

Chapter 76, Acts of 1931, Baltimore City Charter of 1949, Section 584, under which the vehicle here in question was sold, provides that the proceeds from the sale of abandoned vehicles shall go into a special fund of the Police Department, and the rightful owner, upon appearing after the sale, may claim out of that fund the proceeds derived from the sale of the vehicle. This section provides that the sale can be made when the person entitled to possession "cannot be located". It also provides that "the time, place and terms of said sale, together with a full detailed description of said motor vehicle or part thereof,. shall be inserted in one or more daily newspapers published in Baltimore City at least once each week for two successive weeks prior to said sale", and that a registered notice shall be mailed to the owner and lien holder if his address be known "or if it can be ascertained by the exercise of reasonable diligence." The trial judge found that the advertisement did .not appear in the newpaper for sufficient time to comply with the requirements of the statute and that reasonable diligence was not used to locate the owner of the vehicle. With this· conclusion of the trial·judge we agree.

As above set out the advertisement appeared in a daily newspaper on October 28, 1951, and on November 5, 1951, only, and the tractor truck was sold on November 5, 1951, eight days after the first publication. This period of time did not constitute "once each week for two successive weeks prior to said sale". In *Wilson v. Northwestern Mutual Life Ins. Co.,* 8 Cir., Federal Reporter, Volume 65, page 38, the act of Congress provided for "previous publication of notices of such proposed sale being ordered and had once a week for at least four weeks prior to such sale". The Court there said: "A week is seven days. The first publication of this notice was November 10th; its publication for one week, or seven days, could not have been, and was not, complete until 12 o'clock p.m., or midnight, November 16th; its publication for two weeks was not complete until midnight, November 23rd; its publication for three weeks was not complete until midnight, November 30th; and its publication for four weeks was not complete until 12 o'clock p.m., or midnight, of December 7, 1893, but the sale was made at 2 o'clock in the afternoon of that day. It is plain that the notice had not then been published 'for at least four weeks,' and, as the act of congress positively prohibits such a sale unless 'at least four weeks' ' publication has been made and is complete before the sale, this sale cannot be sustained. Our conclusion is that the publication of a notice of sale once a week for only 27 days before the day of sale is not a 'previous publication' of such a notice 'once a week for at least four weeks prior to such sale,' * * *." *Black's Law Dictionary* defines prior as "the former; earlier; preceding."

It is said in *Merrill* on *Notice,* Section 665: "There must be strict compliance with all requirements concerning the time element in published notification." Section 668: "Questions arise concerning specifications that publication shall be 'for' a certain number of weeks before an event. A week in this sense means seven days and the prescription can be satisfied only by pub-

lication starting the specified multiple of seven days prior to the effective date. [*Fisher v. Booher*, 269 Ky. 501, 107 S. W. 2d 307]. However, if the several publications are to be once a week for a specified number of weeks, the spacing need not be exactly seven days apart, provided there is one appearance in each period of seven days and the proper number of hebdomads intervenes between the initial publication and the effective date." [ *King County v. City of Seattle*, 7 Wash. 2d 236, 109 P. 2d 530]. Compare *City of Cincinnati v. Puchta, Mayor et al.* (Supreme Court of Ohio 1916) 115 N. E. 278.

In *Winter v. O'Neill*, 155 Md. 624, the law required that for a tax sale, the collector give notice of the tax sale by advertisement once a week for four successive weeks in two of the daily newspapers published in Baltimore City, and in every issue of the Municipal Journal during said four weeks. The first publication was made November 16, 1915, and the day of sale was December 14, 1915. After reviewing the former cases, this Court said: "The effect of these decisions is to adopt the general rule, as there stated, that in the computation of time, where there is no language indicating that the notice shall be so much clear time, or at least so many days, weeks or months, the rule is not to include or exclude both the day of first publication and the day of sale, but to include one and exclude the other. Applying this general rule to the case before us, we find that, if the day of the first publication or the day of sale either is excluded, and the other included, there will remain twenty-eight days' or four weeks' notice, which is all that the statute requires." In *Hickey v. Peck*, 180 Md. 289, 23 A. 2d 711, 716, where seventeen days elapsed between the first and last publication of an order *nisi* on a tax sale, it was held that this did not comply with the statutory requirement of publication "for three consecutive weeks".

As argued by the appellants, "reasonable diligence" is defined in Words and Phrases Judicially Defined as

follows: "Represents a degree between absolute inaction and an extreme effort undertaken against apparent futility, and must be more than merely perfunctory." *Seale-Lily Ice Cream Co. v. Buck,* 195 Miss. 440, 15 So. 2d 213, 215. "The words 'ordinary' and 'reasonable' descriptive of diligence, are synonymous and are used interchangeably in statutes and by the Courts." *Goodwyn v. Central Railroad Co.,* 2 Ga. App. 470, 58 S. E. 688. The Baltimore Police Department sold the tractor truck here only under the authority of Chapter 76, Acts of 1931, *supra.* It is clearly apparent that the Baltimore Police Department did not exercise either ordinary or reasonable diligence in locating the owner or the person entitled to possession of the vehicle. As above set forth, there was the sticker on the windshield; the "trip contract" under the seat which was easily located by Randall Motors; and the chassis number of the tractor was cut into the steel frame. With these certainly the owner could, with either reasonable or ordinary diligence, have been located. What appears more unusual is that the "abandoned truck" was not reported to the Auto Theft Squad of the Detective Bureau until November 8, 1951, over one hundred days after it had been towed away by the Police Department, although Sergeant Rice of the Auto Theft Department, testified that under normal circumstances such a report is made promptly. Two days after the report to the Auto Theft Squad the owner was located. We must conclude that the statute authorizing the sale was not substantially or even perfunctorily complied with and that the sale by the Police Department was null and void.

Randall Motors, appellant, in its demurrer also stated "that no cause of action lies against the defendants herein [Randall Motors] but only against the other defendants named in these proceedings," the Police Commissioner and the Commissioner of Motor Vehicles. After the tractor trailer was sold by the Police Department it was immediately delivered to Randall Motors

and at the time the replevin suit, herein, was filed neither the Police Commissioner nor the Commissioner of Motor Vehicles was in possession of the tractor truck sought to be replevied. Therefore, the only "proper defendant" was Randall Motors. *Herzberg v. Sachse,* 60 Md. 426. The appellants further contend that the only right of Mack and Kelly "is to claim proceeds of the sale in the special fund held by the Police Commissioner. If, however, their right of action goes beyond claiming the proceeds of the sale, then the recovery should have been determined to be in damages against the Police Commissioner and the Department of Motor Vehicles, since they were instrumental parties in creating the situation which caused the appellants to be lulled into a false sense of security." As pointed out by the Acting Attorney General this is an action in replevin only, and damages in replevin actions are for the detention of the chattel. Code (1951), Article 75, Sections 126, 127 and 128. In *Burnett v. Bealmear,* 79 Md. 36, 28 A. 898, 899, in discussing prayers which had been offered in a replevin action, this Court said: "There is another serious objection to these prayers; they demand a 'verdict and judgment for the plaintiff for the return of the property replevied, at its appraised value, and at least nominal damages.' As the property had been delivered to the plaintiff, it would have been an error to give him a verdict for its appraised value, even if the appraisal was conclusive evidence, as it was not. The proper verdict for the plaintiff, when he is entitled to it, is merely for damages for the detention of the goods." The trial judge therefore was correct in awarding a judgment in favor of the Police Commissioner and the Commissioner of Motor Vehicles for costs.

The appellants claim that the plaintiffs had no title or right of possession which could be asserted against the *bona fide* purchaser due to their illegal actions and acts of omission in the State of Missouri, the *situs* or domicile of the owner or lienor. The Missouri law provides that the chattel mortgage be recorded in the county

of the mortgagor's residence and the mortgage be noted on the automobile certificate of title. Missouri Revised Statutes 1939, Paragraphs 3488 and 3486; 1949 Statute, Paragraphs 443, 480, 443, 460. However, this statute excepts from the requirement of notation on the title, the instance when a purchase money chattel mortgage is taken on a new car sold by a dealer. The dealer in Missouri has no certificate of title to a new car and when the dealer sells it he merely issues a bill of sale. The purchaser applies for a certificate of title. The dealer fully protects himself by showing the mortgage on the bill of sale. In this case the chattel mortgage was recorded on the day of the sale in Jackson County, Missouri, and a bill of sale was issued to the purchaser, Kelly. Mack therefore satisfied the requirements of the recordation statutes.

When a car is sold in Missouri, other than a new car by a dealer, the seller must obtain a certificate of title and endorse an assignment on the same with a warranty of title and deliver the registration to the buyer at the time of the delivery of the vehicle. However, no certificate is required for sale by a dealer of a new vehicle, as in the instant case, but the dealer shall execute a bill of sale for the new car which was done in the instant case. James Kelly had not sold the tractor truck. Therefore at the time it was stolen he was the owner thereof. The Missouri law does provide that no one shall operate a motor vehicle without a certificate of title and without license tags. Of course, license tags cannot be obtained without a certificate of title. Missouri Revised Statutes of 1949, Paragraphs 301.190, 301.210. James Kelly no doubt violated the Missouri law in operating the tractor truck without a certificate of title and without license tags. We can find no authority which holds that such violations of the Missouri law, under the conditions here, affects the title of the motor vehicle. Also, if the conveyance to Kelly was not legally completed, the title was in Mack. Kelly's actions to avoid paying the Missouri sales tax were,

of course, not commendable and no doubt unlawful but do not affect his interest and that of Mack in the tractor trailer.

The chattel mortgage executed to Mack by Kelly contains the provision that if the mortgagor shall fail in his payments provided therein "the mortgagee may take immediate possession of said property without notice or demand. * * * The mortgagee may resell said property at public or private sale with or without notice to the mortgagor" and shall account to the mortgagor for any surplus. Kelly admitted in his testimony that he was in default in his payments under the chattel mortgage, not having paid anything after the vehicle was stolen. Mack took possessory action by bringing the replevin action here. As the general property in chattels usually carries with it the right of possession, ordinarily in replevin the title is involved. Unless at the time of issuing the writ the plaintiff has the right of possession, he cannot succeed, whatever may be his title in other respects. Whenever personal property is held by co-partners, joint tenants or tenants in common, they should join in replevin for its recovery; but where separate and distinct interests are held by several persons in goods, separate actions should be brought; the non-joinder of joint owners or tenants in common cannot, however, be taken advantage of except by a plea in abatement. *Poe* on *Pleading, Tiffany Edition,* Section 251. In Maryland the issue is the right of possession at the time of the issuing of the writ, and not the absolute title to the property for all time. *Anderson v. Stewart,* 108 Md. 340, 349, 70 A. 228; *Hartford Accident & Indemnity Co., Inc. v. State, Use of Ritter,* 201 Md. 433, 94 A. 2d 639, and cases there cited. Technically the judgment should have been rendered for Mack alone, but as there appears to be no conflict between Kelly and Mack and both are represented here by the same attorneys, the judgment will be affirmed.

*Judgment affirmed, with costs.*