896 A.2d 1036

# MAYOR AND TOWN COUNCIL OF OAKLAND

## v.

# MAYOR AND TOWN COUNCIL OF MOUNTAIN LAKE PARK, et al.

### No. 60, Sept. Term, 2005.

Court of Appeals of Maryland.

April 18, 2006.

David M. Funk (Jefferson L. Blomquist, Amanda Stakem Conn, Ernest A. Crofoot, Funk & Bolton, P.A., Baltimore; Robert E. Watson, Oakland), on brief for Appellant.

William M. Rudd (Anderson, Rudd, Donahue & McKee, Cumberland), on brief for Appellees.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, Judge.

The primary question in this case concerns the manner of computation of time required to give notice of the hearing on an annexation resolution. In this case, two municipal corporations seek to annex the same unincorporated area located in Garrett County. The computation of time question on appeal is whether the terminal day, *i.e.,* April 23, 2004, is to be included or excluded in computing the number of days of the statutory requirement of "not less than 15 days after the fourth publication of the notices." We granted certiorari to answer the following questions:

"I. Did the Circuit Court err in applying the common law 'clear time' rule in determining that Oakland failed to set the public hearing on the Oakland Annexation Resolution for not less than 15 days after the fourth publication of the public notices of the Oakland Annexation Resolution as required by Article 23A § 19(d)?

II. Did Mountain Lake Park act in contravention of Article 23A, § 19 in holding a referendum election on the Mountain Lake Park Annexation Resolution before the end of the 45–day period during which referendum petitions may be sub-

mitted under Article 23A, § 19(f) in an effort to make the Mountain Lake Park annexation effective prior to the stated effective date of the Mountain Lake Park Annexation Resolution and the Oakland Annexation Resolution?"

*Oakland v. Mountain Lake Park,* 388 Md. 673, 882 A.2d 286 (2005). We shall answer both questions in the affirmative and reverse the judgment of the Circuit Court for Garrett County.

## I.

On Tuesday, March 16, 2004, The Mayor and Town Council of Oakland, Maryland, introduced an annexation resolution (Oakland resolution), R2004-01,[1] at a regular meeting of the Oakland Town Council, to enlarge its corporate boundaries by annexing property of the Board of Education of Garrett County and the property of Floyd and Eleanor Arnold. Pursuant to Art. 23A § 19(d), public notice of this resolution and the area to be annexed by Oakland was published in *The Republican,* a newspaper of general circulation in Oakland, on March 18, 2004, March 25, 2004, April 1, 2004, and April 8, 2004. The Mayor and Town Council of Oakland held a public hearing on the annexation resolution on April 23, 2004. The Oakland resolution was enacted following the public hearing. The Oakland resolution provided that it would become effective on the forty-sixth day following its enactment, which was June 8, 2004.

The Mayor and Town Council of Mountain Lake Park introduced an annexation resolution (Mountain Lake Park resolution), Resolution No.2004-2, to enlarge the corporate boundaries of Mountain Lake Park by annexing an area known as the "Western Annexation" at a special meeting on Wednesday, March 17, 2004.[2] Included within the boundaries

---

1. According to the Oakland resolution, the property of the Board of Education of Garrett County is located between Dennett Road, South Eleventh Street, and Oakland Avenue, and the property of Floyd and Eleanor Arnold is located at 741 Dennett Road.

2. According to the Mountain Lake Park resolution, the Western Annexation includes 509.820 acres, situate, lying and being in Election District Nos. 7 and 16 of Garrett County, Maryland.

of the Western Annexation was the land sought to be annexed by Oakland, as well as additional land. Pursuant to Art. 23A § 19(d), public notice of the Mountain Lake Park resolution was published in *The Republican,* a newspaper of general circulation in Mountain Lake Park and the Western Annexation, on March 18, 2004, March 25, 2004, April 1, 2004, and April 8, 2004. The Mayor and Town Council of Mountain Lake Park enacted the Mountain Lake resolution following a public hearing on April 28, 2004. The Mountain Lake resolution stated that it would become effective on the forty-sixth day following its enactment, which was June 13, 2004.

Several weeks before the public hearing on the Mountain Lake Park resolution, the Town Clerk of Mountain Lake Park prepared a referendum petition that was circulated to the residents of Parkwood Village East, an apartment complex within the Western Annexation. A resident advocate of that community, after speaking with the Town Clerk, informed the residents of that apartment complex that it would be of financial benefit to them to be annexed into Mountain Lake Park, and therefore, they should sign the petition for referendum. Deposition testimony revealed that the petition was circulated only to the residents of Parkwood Village East because Mountain Lake Park officials believed that Parkwood residents supported Mountain Lake's annexation efforts.

Following a submission of the requisite number of signatures on a referendum petition, the referendum election was scheduled for May 22, 2004 at Parkwood Village East, and public notice of this election was published in *The Republican* on April 29, 2004 and May 6, 2004 pursuant to Art. 23A § 19(i). Thirty-one residents of Parkwood Village East[3] voted in the referendum election on May 22, 2004, and a majority of those persons voted in favor of annexation by Mountain Lake Park.

---

3. Only the residents of Parkwood Village East participated in this election.

Two days before the end of the forty-five day period permitted for the submission of a referendum petition on the Mountain Lake resolution, on June 10, 2004, a resident of the Western Annexation, not residing in Parkwood Village East, submitted another referendum petition on the resolution. Mountain Lake Park did not accept this second petition.

The Mayor and Town Council of Mountain Lake Park filed in the Circuit Court for Garrett County a Complaint for Declaratory Relief pursuant to Md.Code (1973, 2002 Repl.Vol., 2005 Cum.Supp.), § 3–403 of the Courts and Judicial Proceedings Article, seeking a declaration that the Oakland resolution, No. R2004–01, was void because the Mayor and Town Council of Oakland did not comply with the notice requirement of Art. 23A § 19(d). The Mayor and Town Council of Oakland filed a Counter–Complaint seeking a judgment declaring the referendum election on the Mountain Lake resolution void and having no impact on the effective date of the Oakland resolution, that the effective day of the Mountain Lake Park resolution could not have been prior to June 12, 2004, which was forty-five days after its enactment, and that the Mountain Lake resolution was ineffective because the Oakland resolution was effective first.[4]

The Complaint alleged that the annexation resolution adopted by the Mayor and Town Council of Oakland on April 23, 2004 was not in conformance with Article 23A § 19. The facts were not in dispute. Oakland held its annexation resolution hearing on April 8, 2004, and adopted the resolution on

---

4. Under Art. 23A § 19 the "enactment" date and the "effective" date of an annexation resolution are different. *See* Art. 23A § 19(e) ("The resolution shall not become *effective* until at least forty-five (45) days following its final *enactment* ") (emphasis added). Because the Oakland resolution was going to be effective first, assuming Oakland followed statutory procedures properly, the land identified in the Oakland resolution was annexed by Oakland. Therefore, under the annexation statute, Oakland alleged in its Counter-complaint that Mountain Lake Park could not properly annex any of the land annexed by Oakland. *See* Art. 23A § 19(m) ("The provisions of this section shall authorize an increase in the area within any municipal corporation only as to land which is not then within the corporate limits of any other municipal corporation").

April 23, 2004. The notice was published four times in *The Republican*, with the last publication date on April 8, 2004. The pertinent provision of the annexation statute requires that there be fifteen days between the fourth publication of the notices and the public hearing on the annexation resolution. The question before the Circuit Court was whether April 23rd was to be included in determining whether there was not less than fifteen days before the hearing was held.

The Circuit Court held that the town of Oakland had not complied with the requirements of Art. 23A § 19, and that the hearing which was held on April 23, 2004 was less than fifteen days after the publication of the last advertisement.[5] The Court voided Oakland's annexation on the ground that Oakland failed to comply with the notice requirements of Art. 23A § 19(d), and that Mountain Lake's annexation of the disputed area was valid. The Court ruled as follows:

"When the statute reads 'not less than 15 days from the date of the last publication,' it means not less than 15 full days from the last publication. In determining compliance in this situation, the Court counts forward beginning with

---

5. In a declaratory judgment action, the circuit court must enter a declaratory judgment on a separate document, declaring the rights and obligations of the parties. *See* § 3–406 of the Courts and Judicial Proceedings Article ("Any person ... whose rights, status, or other legal relations are affected by a ... municipal ordinance ... may have determined any question or construction or validity arising under the ... ordinance ... and obtain a declaration of rights, status, or other legal relations under it"); Md. Rule 2–601(a) (stating, in pertinent part, that "[e]ach judgment shall be set forth on a separate document"); *Secure Financial Service, Inc. v. Popular Leasing USA, Inc.*, 391 Md. 274, 281, 892 A.2d 571, 575 (2006); *Allstate v. State Farm*, 363 Md. 106, 117 n. 1, 767 A.2d 831, 837 n. 1 (2001). In this case, the trial court failed to do so, and on remand, the court shall enter a judgment consistent with this opinion. We have admonished trial courts repeatedly that when a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, the circuit court must enter a declaratory judgment. *Secure Financial*, 391 Md. at 281, 892 A.2d at 575; *Converge v. Curran*, 383 Md. 462, 477, 860 A.2d 871, 880 (2004). Because there is a justiciable controversy regarding the parties' annexation ordinances, a declaratory judgment action is proper in this case. *See* § 3–409(a) of the Courts and Judicial Proceedings Article; *Converge*, 383 Md. at 478, 860 A.2d at 880.

the day after the last date of publication, and 15 days is not 14 and½ days. As to the consequences of the breach of time, one could speculate, but it simply cannot be measured. The only recourse is to start over again, if possible. So, the first ruling the Court makes is that the Doctrine of Substantial Compliance does not apply.

"Now, Mt. Lake Park's petition to annex the same, and additional property, was enacted, and on the very next day a petition for referendum was filed. Was this petition to defeat Oakland's time? Well, it certainly has that aroma to it. But it was timely filed; it was published conspicuously, and the people were able to vote on it. It was not defeated; it passed. Mr. Tinsley was from the same area and wanted to file his own petition. The petition from the affected area had already been filed, and to have another petition would simply be confusing to say the least.

"The [Board of Garrett County] Commissioners could have filed a petition, and the citizens from Mt. Lake Park could have filed a petition, but they didn't. The referendum was filed from the affected area. It was voted on and it passed, and the rest is speculation.

"So the ruling of this Court is that Oakland did not comply with its time, and that the Mt. Park Annexation is valid."

Oakland noted a timely appeal to the Court of Special Appeals. This Court granted Oakland's petition for writ of certiorari while Oakland's appeal was pending before the intermediate appellate court. *Oakland v. Mountain Lake Park*, 388 Md. 673, 882 A.2d 286 (2005).

## II.

The question of the sufficiency of the notice turns on the construction of Md.Code (1957, 2005 Repl.Vol.), Art. 23A § 19(d) and Md.Code (1957, 2005 Repl.Vol.), Art. 1 § 36. The issue in this case is the proper method of calculating the notice period described in the statute. Art. 23A § 19 sets out the procedure for annexation of land in Maryland. Art. 23A

§ 19(d) provides that after the introduction of an annexation resolution into the legislative body of a municipality, there must be public notice and a public hearing before the annexation resolution may be enacted by the legislative body. The public hearing shall be set for "not less than 15 days after the fourth publication of the notices." The pertinent part of Art. 23A § 19(d) reads as follows:

"The public notices shall specify a time and place at which a public hearing will be held by the legislative body on the resolution; *the hearing shall be set for not less than 15 days after the fourth publication of the notices* or, if the total area of the proposed annexation is for 25 acres of land or less, not less than 15 days after the second publication of the notices, and shall be held either within the boundaries of the municipal corporation or within the area to be annexed."

(Emphasis added). In the case before us, the hearing was held either fourteen days after the last publication of the notices, or fifteen days, depending upon whether the hearing could properly be held on the fifteenth day. We must decide the meaning of "not less than 15 days" as used in Art. 23A § 19(d).

Petitioner argues that the Circuit Court was wrong in voiding Oakland's annexation resolution and that the Court computed the days improperly. Petitioner maintains that the phrase "not less than 15 days" permits the town to hold the hearing on the fifteenth day and that the trial court erred in applying the common-law clear-time rule and holding that fifteen *clear* days were required. Petitioner asserts that the Circuit Court erroneously applied the clear-time rule to conclude that the public hearing should have been held after April 23, 2004.

Petitioner's argument is grounded in Art. 1 § 36, which establishes a uniform method for computing time in Maryland. Art. 1 § 36 provides in pertinent part, as follows:

"*In computing any period of time prescribed or allowed by any applicable statute,* the day of the act, event, or default, after which the designated period of time begins to run is

not to be included. The last day of the period so computed is to be included.... When the period of time allowed is more than seven days, intermediate Sundays and holidays shall be considered as other days...."

(Emphasis added). Petitioner maintains that by the plain language of the statute, the time computation method in Art. 1 § 36 applies to the notice period set out in Art. 23A § 19(d). Petitioner's position is that under Art. 1 § 36, the last day of period is included in the computation of time, and therefore, a hearing held on the fifteenth day would satisfy the statutory requirements of Art. 23A § 19(d). Had the Circuit Court applied Art. 1 § 36 to the matter *sub judice,* petitioner continues, it would have concluded that the public hearing on the Oakland resolution was held properly on April 23, 2004, because that was the "15 days after the fourth publication of the notices" required by Art 23A § 19(d).

Respondent argues that the general computation of time rule set out in Art. 1 § 36 is inapplicable to the calculation of time under Art. 23A § 19(d) because the latter statute uses the phrase "not less than 15 days after the fourth publication of the notices," which requires an application of the clear-time rule, an exception to the general rule for the computation of time. Under the common-law clear-time rule, if an action requires the expiration of a certain number of days, then both the first day and the final day are excluded from the time computation. Therefore, Art. 23A § 19(d) did not permit the Mayor and Town Council of Oakland to hold the public hearing on the Oakland resolution on April 23, 2004 because that date was less than fifteen days of clear time after the fourth publication of notices.

We first turn to the question of whether the clear-time rule governs the computation of time under Art. 23A § 19. We conclude that the general method for computing time set out in Art. 1 § 36 applies, because the Legislature did not express an intent to the contrary.

### III.

 The general rule in Maryland, as in most other states, is that in computing the time for the performance of an act or an event, the designated first day is excluded and the last day of the period is included. *See Equitable Life Assurance v. Jalowsky,* 306 Md. 257, 262, 508 A.2d 137, 139 (1986); *Winter v. O'Neill,* 155 Md. 624, 635, 142 A. 263, 268 (1928). *See generally* J.A. Bock, Annotation, *Inclusion or Exclusion of First and Last Days in Computing the Time for Performance of an Act or Event Which Must Take Place a Certain Number of Days Before a Known Future Date,* 98 A.L.R.2d 1331 (1964). The general rule is applicable unless there is an indication or intention to count only "clear" or "entire" days. *See Winter v. O'Neill,* 155 Md. at 635, 142 A. at 268; *Graham v. Wellington,* 121 Md. 656, 660, 89 A. 232, 233 (1913); *Harris v. Latta,* 298 N.C. 555, 259 S.E.2d 239, 240 (1979). In *Graham,* we noted, in construing the election law requiring that certificates of nomination should be filed *not less than twenty-five days* before the election, that "[w]hile the general rule, in the computation of time, is to include one day and exclude the other, and not to include or exclude both, there are many decisions which hold that if a statute indicates that there are to be so many *clear* days, or that requires so many days *at least,* both are to be excluded." 121 Md. at 660, 89 A. at 233.

The Maryland General Assembly codified the common-law method of time computation, initially enacted in 1941 as Art. 94 § 2, with the express purpose of establishing "*a uniform method* of computing *any period of time* prescribed or allowed by the rules of any Court, or by order of Court, or by any applicable statute." 1941 Md. Laws, Chap. 522. (emphasis added). The Act, now codified as Art. 1 § 36,[6] provides as follows:

---

6. Art. 1 § 36 was codified previously at Md.Code (1957, 1995 Repl. Vol.), Art. 94 § 2. In 1997, the General Assembly transferred the statute from Art. 94 § 2 to Art. 1 § 36 without substantive changes. *See* 1997 Md. Laws, Chap. 31, § 6; Md.Code (1957, 1996 Repl.Vol., 1997

"In computing any period of time prescribed or allowed by any applicable statute, the day of the act, event, or default, after which the designated period of time begins to run is not to be included. The last day of the period so computed is to be included unless: (1) It is a Sunday or a legal holiday, in which event the period runs until the end of the next day, which is neither a Sunday or a holiday; or, (2) the act to be done is the filing of some paper in court and the office of the clerk of said court on said last day of the period is not open, or is closed for a part of a day, in which event, the period runs until the end of the next day which is neither a Sunday, Saturday, a legal holiday, or a day on which the said office is not open the entire day during ordinary business hours. When the period of time allowed is more than seven days, intermediate Sundays and holidays shall be considered as other days; but if the period of time allowed is seven days or less, intermediate Sundays and holidays shall not be counted in computing the period of time."

*See also* Md. Rule 1–203 (governing computation of time).

In concluding that the Oakland resolution was invalid because Oakland did not wait fifteen clear days before holding a public hearing after the fourth publication of notices, the Circuit Court did not use the method prescribed by this statute in computing the applicable time. Because Art. 1 § 36 provides a uniform method for computing time prescribed by Maryland law and Art. 23A § 19 does not contain any exceptions to this general rule, the Circuit Court construed these statutes incorrectly.

This Court has applied the statutory rule for computing time to the determination of the amount of time required

---

Cum.Supp.), Art. 1 § 36. The statute reads the same today. *See* Md.Code (1957, 2005 Repl.Vol.), Art. 1 § 36. The statute was last changed substantively in 1957. *See* 1957 Md. Laws, Chap. 399, § 40 (repealing the part of the statute making the computation method applicable to time periods prescribed or allowed by rules or orders of court). Computing time periods prescribed by rules or order of court is now governed by Md. Rule 1–203.

under a number of different statutory schemes. *See, e.g., Grayson v. State,* 354 Md. 1, 14–15, 728 A.2d 1280, 1286 (1999) (applying Art. 1 § 36 to conclude that a post-conviction petition was timely filed under the Post Conviction Procedure Act, then Art. 27 § 645A); *D & Y, Inc. v. Winston,* 320 Md. 534, 536–37, 578 A.2d 1177, 1178–79 (1990) (applying Art. 94 § 2 to conclude that a land installment contract was recorded one day late); *Equitable Life Assurance v. Jalowsky,* 306 Md. 257, 265, 508 A.2d 137, 141 (1986) (applying Art. 94 § 2 to determine that the insured died within the two-year period during which the life insurance policy was subject to contest); *Yingling v. Smith,* 259 Md. 260, 262–63, 269 A.2d 612, 613 (1970) (applying Art. 94 § 2 to determine whether a bill of complaint was timely filed in a suit against an executor); *State Housing, Inc. v. Baltimore,* 215 Md. 294, 298, 137 A.2d 708, 711 (1958) (applying Art. 94 § 2 to determine date by which an appeal from a decision of the Board of Municipal and Zoning Appeals of Baltimore had to be taken); *Fischer v. Fischer,* 193 Md. 501, 505–06, 69 A.2d 51, 52 (1949) (applying Art. 94 § 2 to conclude that an appeal was taken in time); *see also Pumphrey v. Stockett,* 187 Md. 318, 322–23, 49 A.2d 804, 806–07 (1946).

*Equitable Life Assurance Society of the United States v. Jalowsky,* 306 Md. 257, 508 A.2d 137 (1986) is instructive as to the application of the statutory rule for computing time to the matter *sub judice.* In *Jalowsky,* we explained that Md.Code (1957, 1985 Repl.Vol.), Art. 94 § 2, now codified at Art. 1 § 36 with no changes, essentially is a codification of the common-law rule, requiring the "exclusion of the first day and the inclusion of the last [day]" in computing time commencing from a particular day. *See id.* at 262, 508 A.2d at 139. We applied Art. 94 § 2 to determine the final date on which an insurer could contest the validity of an insurance policy under Art. 48A § 390. Md.Code (1957, 1979 Repl.Vol., 1985 Cum. Supp.), Art. 48A § 390 provides that, in pertinent part, a life insurance policy "shall be incontestable, except for the nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of two (2) years from its

date of issue." [7] Writing for this Court, Chief Judge Robert Murphy explained why Art. 94 § 2 and Art. 48A § 390 must be construed together:

"It is thus clear that Art. 48A, § 390 contains a two-year limitation for contesting an insurance policy while Art. 94, § 2 addresses the computation of time periods contained in applicable statutes. Both statutes relate, at least in part, to the same subject matter—that of time. We have long held that 'in construing legislative enactments, all statutes relating to the same subject matter are to be considered and harmonized as far as possible.' In addition, there is a 'policy that statutes are not to be construed to alter the common-law by implication.'

\* \* \*

"As previously indicated, Art. 94, § 2 codified the then existing common law rule for computing time. In this regard, the General Assembly 'is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law.' Article 94, § 2 preceded Art. 48A, § 390; hence, the General Assembly is presumed to have had full knowledge of its content and underlying policy when it passed Art. 48A, § 390."

*Id.* at 263, 508 A.2d at 140 (citations omitted). Because the General Assembly did not exempt Art. 48A § 390 from the generally applicable method of computing time set forth in Art. 94 § 2, we construed the two statutes in harmony and provided full effect to each of them. *Id.* at 265, 508 A.2d at 141. In calculating the applicable two-year period under the statute, we excluded the day on which the policy was issued, explaining that "the limitations period commences on the following first full day." *Id; see also Fischer,* 193 Md. at 505–06, 69 A.2d at 52 (concluding that Art. 94 § 2 requires that a

---

7. Art. 48A § 390 is now codified at Md.Code (1997, 2002 Repl.Vol., 2005 Cum.Supp.), § 16–203(a) of the Insurance Article, with no substantive changes.

Maryland rule governing time for when an appeal may be noted "must be construed in light of that statute" because its intent is "to make uniform the method of computation of time").

Respondent argues that the general rule and the method for time computation set forth in Art. 1 § 36 does not apply to Art. 23A § 19 because Art. 23A § 19(d) uses the phrase "not less than 15 days," thereby triggering the clear-time rule. The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. *See Moore v. State,* 388 Md. 446, 452, 879 A.2d 1111, 1114 (2005). In ascertaining legislative intent, we first examine the plain language of the statute, and if the plain language of the statute is unambiguous and consistent with the statute's apparent purpose, we give effect to the statute as it is written. *See Piper Rudnick v. Hartz,* 386 Md. 201, 218, 872 A.2d 58, 68 (2005). If a statute has more than one reasonable interpretation, it is ambiguous. *Moore,* 388 Md. at 453, 879 A.2d at 1114. If the language of the statute is ambiguous, we resolve the ambiguity in light of the legislative intent, considering the legislative history, case law, and statutory purpose. *See Comptroller v. Phillips,* 384 Md. 583, 591, 865 A.2d 590, 594 (2005). We consider both the ordinary meaning of the language of the statute and how that language relates to the overall meaning, setting, and purpose of the act. *See Deville v. State,* 383 Md. 217, 223, 858 A.2d 484, 487 (2004). We avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense. *See Gwin v. MVA,* 385 Md. 440, 462, 869 A.2d 822, 835 (2005). We construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory. *Moore,* 388 Md. at 453, 879 A.2d at 1115.

In construing statutes, we presume that the General Assembly acted with full knowledge of prior legislation and intended statutes affecting the same subject matter "to blend into a consistent and harmonious body of law." *Pete v. State,* 384 Md. 47, 65, 862 A.2d 419, 429 (2004). Therefore, we read together statutes on the same subject and harmonize

them to the extent possible, so as to avoid rendering either statute "or any portion, meaningless, surplusage, superfluous or nugatory." *Id.* at 65–66, 862 A.2d at 429–30.

In the context of Art. 23A § 19(d), we do not find that the Legislature's use of the phrase "not less than" was intended to invoke the clear-time rule and to reject the application of the uniform method for time computation as set out in Art. 1 § 36. Article 1 § 36 was enacted initially in 1941; Art. 23A § 19(d) was enacted in 1955. As we noted in *Equitable Life Assurance Society of the United States*, the Legislature is presumed to have had full knowledge of the content and underlying policy set out in Art. 1 § 36. 306 Md. at 263, 508 A.2d at 140. Therefore, more than merely the use of the words "not less than" is required to express a legislative intent to employ a different method of time calculation than "the uniform method of time computation" set out in the statute. *See id.* at 263, 508 A.2d at 140. The cases relied upon by respondent, with the exception of *Pumphrey v. Stockett,* 187 Md. 318, 49 A.2d 804 (1946),[8] all predate the enactment of Art. 1 § 36 and are no longer persuasive. *See, e.g., Iverson v. Jones,* 171 Md. 649,

---

8. In *Pumphrey v. Stockett,* 187 Md. 318, 49 A.2d 804 (1946), the Court rejected the application of the clear-time rule, and held that the method for time computation set out in the statute, Art. 94 § 2, was applicable. *Id.* at 322–23, 49 A.2d at 806–07. The issue was the use of the word "within" in the election law. The Court held that "[t]he method of computation of time, long a matter of difficulty, has been settled in this State by the passage of the Act of 1941, Chap. 522, codified as Section 2, Article 94 of the Code, 1943 Supp. . . . ." *Id.* at 322, 49 A.2d at 806. The Court addressed appellant's argument, that the clear-time rule should apply. Citing as authority *Walsh v. Boyle,* 30 Md. 262 (1869), *Graham v. Wellington,* 121 Md. 656, 89 A. 232 (1913), *Owens v. Graetzel,* 146 Md. 361, 126 A. 224 (1924), and *Iverson v. Jones,* 171 Md. 649, 187 A. 863 (1936), appellant argued that the clear-time rule should apply. In *dicta,* the Court rejected his argument, stating as follows:

"These cases are concerned with statutes where a definite and precise indication is given that 'clear' time is meant by the use of words such as 'at least' or 'not less than.' We find no such meaning in the word 'within.' *Stiegler v. Eureka Life Ins. Co.,* 146 Md. 629, at pages 655, 656, 127 A. 397. And the cases hold, that in the absence of such meaning, the day of the act is to be excluded, which is the rule subsequently adopted by the Legislature."

652–653, 187 A. 863, 865 (1936) (*concluding that the phrase* "not less than eighteen days before" requires eighteen clear days); *Winter v. O'Neill,* 155 Md. 624, 635, 142 A. 263, 268 (1928) (acknowledging that a statute using the phrase "at least" or "not less than" requires clear time); *Owens v. Graetzel,* 146 Md. 361, 368, 126 A. 224, 229 (1924) (explaining that the phrase "at least three weeks" means "three clear weeks"); *Iverson v. Perlman,* 137 Md. 62, 67–68, 111 A. 220, 222 (1920) (concluding that the phrase "not less than thirty days" means thirty clear days); *Graham v. Wellington,* 121 Md. 656, 660, 89 A. 232, 233 (1913) (indicating that the phrase "not less than twenty-five days" requires twenty-five clear days); *Walsh v. Boyle,* 30 Md. 262, 266–67 (1869) (discussing English cases recognizing the clear-time rule).

In 1948, then Attorney General Hall Hammond, later Chief Judge of the Court of Appeals of Maryland, in an opinion to the Maryland Secretary of State regarding the final date on which a candidate for public office could withdraw a certificate of candidacy for nomination, explained his view that the general statutory rule for computing time was applicable to statutes where an act is to be done "at least" or "not less than" a given time. *See* 33 Op. Att'y Gen. 166, 168 (1948). The statute Attorney General Hammond was asked to construe required that withdrawal certificates be filed *at least* thirty days before the day of the primary election. General Hammond stated in the opinion letter that the method of computation was that prescribed in Art. 94 § 2, the uniform method for time computation, rather than the clear-time rule. He stated as follows:

"It is our opinion that Section 2 of Article 94 of the Code is to govern the computation of time, and that the formula which it prescribes is not to be disregarded or ignored

---

*Id.* at 323, 49 A.2d at 807. Obviously, *dictum* is not controlling authority. We think the better view is that the Legislature did not intend to trigger the application of the clear-time rule through the use of phrases such as "at least" or "not less than," and that the Legislature knows how to explicitly require the application of clear time, when that is its intention.

because of the phraseology of the statute or rule under consideration. In other words, we believe that the statute is applicable alike in those instances where an act is to be done 'at least' or 'not less than' a given time, as well as where it is to be done 'within' a stated period."

33 Op. Att'y Gen. at 168.

Courts' treatment of the effect on the computation of time of the words "at least" or "not less than," where an act is required to take place at least or not less than a certain number of days before a known future date, has not been consistent. *See* J.A. Bock, *supra,* 98 A.L.R.2d at 1337 (noting that a number of cases have held that such expressions have no effect on the general rule, and that other courts have taken the view that the expressions imply a count of clear days).

With respect to the use of the phrase "at least" in a contract, the North Carolina Supreme Court stated as follows:

"We conclude that use of this phrase does not alter the general rule for the computation of time. We stress again that the phrase 'at least' is not specially defined in the option contract and therefore must be given its ordinary meaning. When this is done, it is clear that the phrase 'at least' does not specify which *method* of computation is to be used; rather, it merely serves to emphasize that a *minimum* of sixty days' notice must be given, to be computed in the manner in which time is normally reckoned.

"It is important to note that the general rule for computation of time in this jurisdiction comports with the manner in which persons of ordinary understanding would determine the time within which an act is to be done."

*Harris v. Latta,* 298 N.C. 555, 259 S.E.2d 239, 241–42 (1979) (citations omitted); *Treadway v. Miller,* 354 S.W.2d 500, 501–02 (Ky.1962); *Watson v. Koontz,* 74 Nev. 254, 328 P.2d 173, 174 (1958); *State v. Lacklen,* 129 Mont. 243, 284 P.2d 998, 1003 (1955).

The Delaware Supreme Court has explained that the legislature's use of the phrase "at least" in a statute expresses "the idea of a minimum and nothing more," and as such, does not indicate a legislative intent to depart from the general rule for

time computation. *Santow v. Ullman,* 166 A.2d 135, 139 (Del.1960); *see also Maciborski v. Chase Serv. Corp. of Az.,* 161 Ariz. 557, 779 P.2d 1296, 1302 (Ct.App.1989) (concluding that the legislature's use of the phrase "at least" or "not less than" in a statute does not indicate an intent to depart from the general rule for time computation, and explaining that the use of these phrases in a statute reflects both "the minimum time period [required] and that a longer time would be permissible"). The court found that construing the Legislature's use of the phrase "at least" or "not less than" to require the application of the clear-time rule is unsound:

"The list of exception cases appears impressive. But, as will be seen, there are very weighty objections to the soundness of these decisions. None of them contains any real discussion of the basis of the exception, nor any satisfactory reason why the addition of the phrase 'at least' is sufficient to indicate a legislative intent to depart from the general rule. Why should 'at least seven days notice' mean, in common parlance, eight days' notice? Our exception cases derive from *Robinson v. Collins,* [1 Har. 498]. The memorandum of the decision contains only the pronouncement that the service 'must be exclusive of both the day of the service and the day of the return.'

"No authority is cited, but it is permissible to surmise that it followed the English precedents.

\* \* \*

"In 1838 the same Court [in *The Queen v. The Justices of Shropshire,* 8 Ad. & E. 173] had before it the same question, i.e., the construction of the phrase 'fourteen days at least.' The point was fully argued. The Court, with marked reluctance, adhered to the rule in *Zouch v. Empsey,* [4 B. & Ald. 522 (1821) ], though solely on the ground of adherence to precedent. Three of the four justices expressed their disapproval of the rule."

*Id.* at 138.

Our early cases stating that use of the phrase "at least" warrants application of the clear-time rule have their

genesis in the same line of English cases addressed by the Delaware Supreme Court in *Ullman;* those cases do not explain why the use of "at least," or any other phrase warrants the application of the clear-time rule. *See Walsh v. Boyle,* 30 Md. 262, 266–67 (1869) (citing *The Queen v. The Justices of Shropshire,* 8 Ad. & E. 173 (1838), for the proposition that a statute requiring fourteen days at least, means fourteen clear days, without additional discussion). We conclude that the use of the phrase "at least," "not less than," or "within," is, standing alone, insufficient to indicate a legislative intent to deviate from the uniform method for computation of time as set out in Art. 1 § 36.

Accordingly, in the absence of unambiguous legislative intent to apply a computation method different than that set out in Art. 1 § 36, we reject the application of the clear-time rule to the computation of time required under Art. 23A § 19(d). We hold that the Circuit Court erred in applying the clear-time rule to Art. 23A § 19(d). Construing these statutes together and providing each full effect, we exclude April 8, 2004, the day on which the fourth publication of notices by Oakland in *The Republican* occurred, from the computation of the fifteen-day period required before a public hearing can be held on an annexation resolution. Fifteen days from April 9, 2004, the day after the fourth publication of notices, is April 23, 2004, the day on which Oakland held the hearing. April 23, 2004 was neither a Sunday nor a legal holiday. Oakland was permitted to hold its public hearing on the annexation resolution on that day.

## IV.

We turn next to the period of time during which referendum petitions for annexation may be submitted under Art. 23A § 19 and whether Mountain Lake Park acted in contravention of the statute.

With respect to annexation of land in Maryland, we have explained that "[t]he extension of the boundaries of a municipality is a political matter to be regulated by the constitution or the legislature of the State" and that "[c]ustomarily, the

power to annex is delegated to the city or town by statute, since those political entities have no inherent powers to add to their size." *Rockville v. Brookeville,* 246 Md. 117, 128–29, 228 A.2d 263, 270 (1967). By enacting Art. 23A § 19, the General Assembly provided municipal corporations [9] with the power to annex land. *Id.* at 129, 228 A.2d at 270; *see* 1955 Md. Laws, Chapter 423. Every municipal corporation in Maryland may annex contiguous land not within the boundaries of another municipality upon the initiative of the municipality's legislative body, or a written petition signed by not less than twenty-five percent of the persons who reside in the area to be annexed and who are registered as voters in county elections in the precinct in which the territory to be annexed is located. *See* Art. 23A § 19(a)—(c). The resolution required to annex the unincorporated area may be either introduced by the legislative body of the municipality in accordance with the requirements of Art. 23A § 19(b) or be introduced by the legislative body following a petition by residents satisfying the requirements of Art. 23A § 19(c).[10] Once an annexation resolution is introduced pursuant to the requirements of Art. 23A § 19(b)

---

**9.** Article 23A § 9(a) defines a "municipal corporation" in pertinent part, as follows:

> "As used in this subtitle the term 'municipal corporation' shall include all cities, towns and villages, now or hereafter created under any general or special law of this State for general governmental purposes, which are subject to the provisions of Article XI–E of the Maryland Constitution, which possess legislative, administrative and police powers for the general exercise of municipal functions, and which carry on such functions through a set of elected and other officials."

**10.** Art. 23A § 19(b) provides as follows:

> *"Initiation by legislative body.*—(1) The proposal for change may be initiated by resolution regularly introduced into the legislative body of the municipal corporation, in accordance with the usual requirements and practices applicable to its legislative enactments, and also in conformity with the several requirements contained in subsections (b) and (c) of § 13 of this subtitle, but only after the legislative body has obtained the consent for the proposal from not less than 25 percent of the persons who reside in the area to be annexed and who are registered as voters in county elections and from the owners of not less than 25 percent of the assessed valuation of the real property located in the area to be annexed.

or (c), notice must be provided and a public hearing must be held on the annexation resolution, pursuant to the requirements of Art. 23A § 19(d).

Following the public hearing, the legislative body of the municipality may enact the annexation resolution, although the resolution "*shall not become effective* until at least forty-five (45) days following its final enactment." Art. 23A § 19(e) (emphasis added). Those individuals residing in the area to be annexed who are registered as voters in county elections in the precinct in which the territory to be annexed is located may petition for referendum of the resolution "[*a* ]*t any time* within the 45 day period following the final enactment of the resolution." Art. 23A § 19(f) (emphasis added).[11] Those resi-

---

> The resolution shall describe by a survey of courses and distances, and may also describe by landmarks and other well-known terms, the exact area proposed to be included in the change, and shall contain complete and detailed provisions as to the conditions and circumstances applicable to the change in boundaries and to the residents and property within the area to be annexed."

Art. 23A § 19(c) provides in pertinent part, as follows:

> "*Initiation by petition.*—The proposal for change also may be initiated by a written petition signed by not less than twenty-five per centum (25%) of the persons who reside in the area to be annexed and who are registered as voters in county elections in the precinct or precincts in which the territory to be annexed is located, and by the owners of not less than twenty-five per centum (25%) of the assessed valuation of the real property located in the area to be annexed."

The record reveals that the legislative bodies of Oakland and Mountain Lake Park introduced their respective annexation resolutions pursuant to Art. 23A § 19(b) and obtained the required consent of not less than twenty-five percent of the individuals residing in the areas to be annexed.

11. Art. 23A § 19(f) provides as follows:

> "*Petition for referendum by residents of area to be annexed.*—At any time within the 45 day period following the enactment of the resolution, a number of persons equal to not less than 20 percent of the persons who reside in the area to be annexed and who are registered as voters in county elections in the precinct or precincts in which the territory to be annexed is located may, in writing, petition the chief executive and administrative officer of the municipal corporation for a referendum on the resolution. Upon the presentation of a petition to the officer, he shall cause to be made a

dents of the annexing municipality who are qualified voters may petition for referendum on the resolution "[a ]t *any time* within the forty-five day (45) period following the final enactment of the resolution." Art. 23A § 19(g) (emphasis added).[12] Finally, the governing body of the counties or county in which the municipality is located, by at least a two-thirds majority vote, may petition in writing the chief executive of the municipality for a referendum on the resolution "*at any time* within the 45–day period following the final enactment of the resolution." Art. 23A § 19(h) (emphasis added).[13] Subsections (f), (g), and (h) each provides that the chief executive officer of the

---

verification of the signatures thereon and shall ascertain that the persons signing the petition represent at least 20 percent of the persons who reside in the area to be annexed and who are registered as voters in county elections in the precinct or precincts in which the territory to be annexed is located. Upon verifying that the requirements of this subsection have been complied with, the officer shall by proclamation suspend the effectiveness of the resolution, contingent upon the results of the referendum."

12. Art. 23A § 19(g) provides as follows:
"*Petition for referendum by residents of municipality.*—At any time within the forty-five (45) day period following the final enactment of the resolution, a number of persons equal to not less than twenty per centum (20%) of the qualified voters of the municipal corporation may, in writing, petition the chief executive and administrative officer of the municipal corporation for a referendum of the resolution. Upon the presentation of a petition to the officer, he shall cause to be made a verification of the signatures thereon and shall ascertain that the persons signing the petition represent at least twenty per centum (20%) of the qualified voters of the municipal corporation. Upon verifying that the requirements of this subsection have been complied with, the officer shall by proclamation suspend the effectiveness of the resolution, contingent upon the results of the referendum."

13. Art. 23A § 19(h) provides as follows:
"*Petition for referendum by county governing body.*—At any time within the 45–day period following the final enactment of the resolution, the governing body of the county or counties in which the municipality is located, by at least a two-thirds majority vote, may petition in writing the chief executive and administrative officer of the municipal corporation for a referendum on the resolution. Upon verifying that there has been compliance with the requirements of this subsection, the officer by proclamation shall suspend the effectiveness of the resolution, contingent upon the results of the referendum."

municipality shall suspend the effectiveness of the annexation, pending the results of the referendum on the annexation resolution.

Oakland argues that Mountain Lake Park's holding of a referendum election on May 22, 2004, less than forty-five days after the residents' of Parkwood Village East's submission of a petition for referendum on April 29, 2004, was in contravention of Art. 23A § 19(f). By holding a referendum election and attempting to make its annexation resolution effective prior to the conclusion of the forty-five day period, petitioner argues, Mountain Lake Park ignored the plain language of Art. 23A § 19, thereby disregarding the intent of the General Assembly.

Respondent argues that an annexation resolution can become effective prior to the conclusion of the forty-five day period following the final enactment of the resolution when a petition for referendum is presented and a referendum election on that petition occurs. Because the purpose of the forty-five day period is to provide citizens with sufficient time to circulate and present a referendum petition to the municipality, respondent maintains, waiting for the forty-five day period to elapse once a referendum petition is circulated and presented lacks any purpose. Therefore, respondent concludes, Art. 23A § 19(*l*), providing that an annexation resolution will be effective following the fourteen-day period subsequent to a referendum election, is the period of time applicable to this case.[11]

---

**14.** Art. 23A § 19(*l*) provides as follows:

"*Result of election.*—If only one petition for a referendum is filed and if a majority of the persons voting on the question in that referendum shall vote in favor of the proposal for change, the change shall become effective as proposed on the fourteenth day following the referendum. If two petitions for referendum are filed, the votes cast for the two referenda shall be tabulated separately, so as to show individually the tabulation of votes cast in the municipal corporation and in the area to be annexed. If in both tabulations, each being reckoned separately, a majority of the persons voting on the question shall vote in favor of the proposal for change, the change shall become effective as proposed on the fourteenth day following the

Because a majority of individuals having voted in the referendum election cast votes in favor of annexation, Mountain Lake Park claims that its annexation resolution became effective on June 5, 2004, two weeks after the referendum election was held on May 22, 2004, which is prior to the stated effective date of Oakland's resolution—June 8, 2004.[15] See Art. 23A § 19(*l*) (providing that if the annexation passes referendum, it "shall become effective ... on the fourteenth day following the referendum"). We disagree.

Mountain Lake Park's receipt of one petition for referendum and its holding of a referendum election does not permit it to ignore other provisions of Art. 23A § 19 clearly applicable to the case *sub judice*. *Cf. Blackwell v. City of Seat Pleasant*, 94 Md.App. 393, 406, 617 A.2d 1110, 1116 (1993) (Cathell, J.) (explaining that a municipality's non-compliance with the procedures for enacting a charter amendment pursuant to Art. 23A § 13 "divested the electorate of its right to veto by referendum the Council's attempt to change the basic form of government" of the municipality). The intent of the General Assembly is clear. It provided for the submission of referendum petitions "at any time" within the forty-five days following the enactment of an annexation resolution by the residents of the area to be annexed, the residents of the annexing municipality, and officials of the county governing body in which the municipality is located. *See* Art. 23A § 19(f)—(h). The plain language of the referendum provisions of Art. 23A § 19, subsections (f)—(h), makes clear that the General Assembly intended for a referendum election to occur after the forty-five day period following the enactment of the annexation resolution. By operation of Art. 23A § 19(f)—(h), each constituency receives a fixed period of time during which to

referendum. In the event there are two referenda, unless there is such a favorable majority in both tabulations, reckoned separately, the proposal for change shall be void and of no further effect whatsoever."

**15.** No petition was submitted on the Oakland resolution for referendum, and thus, there was no reason for the chief executive officer to suspend the stated effective date.

consider the proposed annexation, circulate a petition for referendum, and ultimately, present a petition for referendum to the municipality. Moreover, the General Assembly contemplated that more than one referendum petition might be submitted regarding an annexation proposal, which indicates that it did not intend to permit municipalities to alter the prescribed forty-five day time period governing the submission of referendum petitions following the municipality's receipt of a single petition from one constituency.[16] *See* Art. 23A § 19(*l*) (explaining how the election results will be tabulated based on the number of petitions for referendum received). This statutory framework cannot be ignored. *See Kane v. Bd. of Appeals for Prince George's County*, 390 Md. 145, 162, 887 A.2d 1060, 1070 (2005) (explaining that we "construe a statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory").

Respondent's contention that its annexation resolution was effective on June 5, 2004, fourteen days after the referendum election was held as to the petition submitted by residents in the area to be annexed, contravenes Art. 23A § 19. Besides running contrary to Art. 23A § 19(f)—(h), governing the submission of referendum petitions, respondent's argument ignores the plain language of Art. 23A § 19(e). Art. 23A § 19(e) states that an "[annexation] resolution shall not become effective until at least forty-five (45) days following its final enactment." The mandatory language of Art. 23A § 19(e) means that the Mountain Lake Park resolution could not have been effective prior to June 12, 2004, the forty-fifth day following the enactment of the resolution.[17] *See State v. Green*, 367 Md.

---

16. Testimony at trial revealed that another resident of the Western Annexation submitted a referendum petition on June 10, 2004, two days prior to the conclusion of the forty-five day period, though Mountain Lake Park officials took no action in response to it. Art. 23A § 19(*l*) clearly contemplates the possibility that more than one referendum petition could be submitted.

17. The text of the Mountain Lake Resolution stated that it would not become effective until the forty-sixth day following its enactment—June

61, 82, 785 A.2d 1275, 1287 (2001) (recognizing that "[w]hen the Legislature commands that something be done, using words such as 'shall' or 'must' rather than 'may' or 'should,' the obligation to comply with the statute or rule is mandatory").

The Circuit Court erred in concluding that the Mountain Lake Park resolution was valid, and that Oakland failed to follow the requirements of Art. 23A § 19(d).

***JUDGMENT OF THE CIRCUIT COURT FOR GARRETT COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR ENTRY OF A PROPER DECLARATORY JUDGMENT IN CONFORMANCE WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENTS.***

Concurring Opinion by CATHELL, Judge.

I concur with the result reached by the Court. I write separately in order to address an issue of first impression as to the law and also as to the facts presented to the Court in the briefs, but not resolved in the majority's opinion. In this first case (at the level of this Court) of competing annexations in Maryland,[1] we have been asked to adopt the common-law

---

13, 2004. If Mountain Lake Park had followed the requirements of the annexation statute, the effective date would have been later. First, Mountain Lake should have waited forty-five days following enactment for the submission of petitions for referendum. *See* Art. 23A § 19(f)—(g). Next, following the submission of a valid petition, the Mayor should have suspended the effective date of the resolution. *See id.* After that, Mountain Lake should have set a date for the referendum election, not less than fifteen days and not more than ninety days from the publication of the notices that were required to be published for not less than two consecutive weeks in a newspaper of general circulation in the annexing municipality and the area to be annexed. *See* Art. 23A § 19(i). Finally, if a majority of those voting in the referendum election voted in favor of the proposal, the resolution would have been effective two weeks after the referendum election. *See* Art. 23A § 19(*l*). Assuming Oakland's annexation process was properly completed, and thus, its resolution became effective on June 8, 2004, Mountain Lake Park would be barred from annexing the same land. *See* Art. 23A § 19(m).

We express no view concerning the prior jurisdiction rule as it is not an issue before the Court in this case.

1. I have reviewed the cases on Maryland annexations and have discovered no reported Maryland case in which municipalities are fighting to annex the same land at the same time.

"prior jurisdiction rule" for annexations between competing municipalities. This rule provides, generally, as follows:

"The rule that among separate equivalent proceedings relating to the same subject matter, that one which is prior in time is prior in jurisdiction to the exclusion of those subsequently instituted, applies, generally speaking, to and among proceedings for municipal incorporation, annexation, or consolidation of a particular territory. In proceedings of this character, while the one first commenced is pending, jurisdiction to consider and determine others concerning the same territory is excluded. . . . This principle of the common law is based upon the general public policy of the promotion of the orderly administration of government and justice. Thus, the first of two or more annexation proceedings prevails over those subsequently commenced relating to the same property."

2 McQuillin Mun. Corp. § 7.22.20 (3d ed.) (footnotes omitted). *See also* 62 C.J.S. Municipal Corporations § 56; *Rethinking Municipal Annexation Powers,* 24 Urb. Law 247, 289 (1992) ("In the vast majority of states, however, courts have developed the prior jurisdiction rule, which gives priority to the municipality deemed to have initiated proceedings first."); Joni Walser Crichlow, *Competitive Annexation Among Municipalities: North Carolina Adopts the Prior Jurisdiction Rule,* 63 N.C. L.Rev. 1260 (1985). The statement quoted from McQuillin is in accord with my view that compelling reasons exist that should cause this Court to consider the issue, and in doing so, to formally adopt the common law "prior jurisdiction rule" for annexation cases. The annexation statutes, in my view, contemplate an orderly annexation process. The process is laid out very explicitly in Maryland Code (1957, 2005 Repl.Vol.), Art. 23A, § 19. When two or more municipalities [2]

---

**2.** There may have been a third municipality involved in the current controversy. There are several sheets of a Petition to cause the Town of Mountain Lake Park (hereinafter Mountain Lake) annexation to go to a referendum election in the extract on which there is noted *"town of LL Heights voters"* and a note is in the extract dated June 6, 2004, that states: "This is to verify that the Town of Mt. Lake Park has received a

are fighting each other (over the acquisition of tax base by one entity and the efforts of the other to stop development) via annexation, the resulting fracas, as in the present case, is far from orderly. In the case at bar there are two municipalities fighting over tax base—one to acquire it and the other to deny it to the first city. A cursory look at the map of Maryland shows that there are scores of potential battle grounds, and in several instances more than two municipalities are in fighting distance of what one can reasonably presume to be attractive areas for annexation.[3] With the huge increase in property values over the last decade, the attractiveness of the annexation process to expand tax base has increased, and will continue to be attractive as municipal corporations seek to find new sources of revenue in order to fund the services that are increasingly being demanded. Presumably, nearby municipalities will continue to battle annexation of the areas between the cities, by annexation efforts of their own either to secure tax base or to stop development—as in the present case. Even if annexation is a short term fix in respect to the acquisition of tax base (or the stopping of development), it will nevertheless remain popular in the near future to political

---

petition to referendum from people in the annexed area. Judy A. Paugh 6/10/04." Apparently, while Mountain Lake was trying to upset Oakland's plan to annex by a preemptive annexation, its own annexation effort was opposed (or perhaps supported) by residents of another town identified as "LL Heights." LL Heights presumably refers to the town of Loch Lynn Heights, which from the State map appears to be sufficiently close to both Oakland and Mountain Lake to be in a competitive position with Mountain Lake in respect to annexation. From the map it appears closer to Mountain Lake than Mountain Lake is to Oakland.

Thus, it appears that three municipal corporations (or at least their residents) are involved in the present case. One supposes that such competitions and disputes are not rare. All the more reason, I respectfully suggest, for the adoption of the common-law "prior jurisdiction rule" in order to ensure the residents of areas to be annexed of an orderly process in which they can assert their rights not to be annexed.

3. Such areas could include Ocean City/Berlin, Salisbury/Fruitland, Elkton/Northeast, Havre de Grace/Aberdeen/Edgewood, College Park/Greenbelt/Beltsville/Laurel, Potomac/Rockville/Wheaton, and many other municipal combinations.

figures who are primarily concerned with the short term in the first place.

If the maintenance of procedural order, by itself, is not a sufficient reason to adopt the common-law "prior jurisdiction rule," the special burden the lack of the "prior jurisdiction rule" places upon the citizens in the—to be annexed—areas under the Maryland process, is, as I see it, sufficient to justify the adoption of the rule. This is especially true in "involuntary" annexations (i.e., annexations initiated by municipalities as opposed to annexations initiated by residents of the areas to be annexed) such as those at issue in the present proceedings. Maryland Code (1957, 2005 Repl.Vol.), Art. 23A, § 19(f) entitled *"Petition for referendum by residents of the area to be annexed"* provides the process for residents of areas subject to annexation efforts, to petition the issue to a referendum election.[4]

In many instances a substantial number of the residents in areas to be subjected to annexation efforts do not want to be annexed—by any municipality. They resist being the new tax base for their neighboring municipalities. They may not want additional limitations on development. They simply may not want to pay the taxes, pay the water charges, pay sewer charges or be subject to the laws or administrative activities of the municipality. Their efforts to resist annexation are grounded on their ability to petition for a referendum. Bringing the issue to an election is done, as Section 19(f) requires, by the affected citizens obtaining the signatures of "not less than 20 percent of the persons who reside in the area to be annexed and who are registered voters in county elections...." The petition is then presented to the relevant municipal officer for verification, and if verified, a referendum

---

4. There are separate provisions for the residents of the annexing municipality to have the ability to petition annexations to referendum and for them to hold a separate election in the municipality limited to the voter—residents of the municipality. There are also provisions for the county governing body to cause a referendum election to be held by a two-thirds vote of that governing body.

election is subsequently held pursuant to the proper procedures established by statute.

The referendum process is not easy. Often it is a very difficult process to obtain the necessary number of signatures during the allotted period of time and, if the petition is accomplished appropriately and defended during the signature verification process, there remains a very costly and time consuming political process leading up to the referendum election. Generally, the larger the area to be annexed and/or the larger the number of registered voters in the area, the more difficult and expensive the process will be.

What occurred in the case at bar exemplifies the problem. The facts indicated that initially Oakland commenced with an annexation of a 45.395 acre (roughly rectangular) tract contiguous with its municipal border. One hundred percent of the registered voter-residents of that area and the owners of one hundred percent of the assessed value of the area to be annexed, consented. At that point, the area proposed to be annexed by Oakland was separated from (not contiguous to) Mountain Lake. In order to stop Oakland from annexing the small area contiguous to Oakland's borders (but not contiguous to Mountain Lake's borders), Mountain Lake initiated proceedings to annex a much larger 509.820 acre tract that included all of the area between its municipal boundary and the then municipal boundary of Oakland. It thus included the same 45+ acre tract already in the process of being annexed by Oakland. Twenty-five percent of the registered voter-residents of the larger area to be annexed and the owners of twenty-five percent of the assessed value of the larger area to be annexed by Mountain Lake, consented. Mountain Lake said in its notice letter to property owners, dated March 5, 2004, that it was annexing the large tract and, in seeking their consent, stated that:

". . . . The sole purpose of this annexation is to protect our residential areas within the Town from development near our borders which may be detrimental to the health and safety of the citizens of Mountain Lake Park. The failure of the Garrett County Commissioners to enact zon-

ing regulations [5] has forced us to make this decision. Three recent events lend proof to the necessity of this action:

1. The destruction of some of the most productive farmland in the county and the substitution of a racing facility complete with noise, dust, and possible pollution of a stream.

2. The discovery that the Garrett County Commissioners were allowing hunting on property which is adjacent to the Yough Glades School.

3. The failure of the Garrett County Commissioners to take action to protect the public from dangerous buildings. The collapse of the roof of the former Treasure Island facility and the collapse of a building in the Southern Garrett Industrial Park are two examples.

The sad fact is that unless you live in an incorporated town in Garrett County you have no protection from unwanted development and from many other problems. Think of the noisiest and dirtiest type of business you can—it could become your neighbor. . . ." [6]

The most important reason to adopt the rule is the heavy burden placed on residents of unincorporated areas by permitting simultaneous multiple annexations which, if residents want to remain as they are and desire not to be annexed by any entity, they must obtain the signatures on multiple petitions to bring the multiple annexation efforts to multiple referendums. As an example, in the instant case, if the residents of the 45 + acre tract sought to be annexed by

---

**5.** Garrett County has no county-wide zoning.

**6.** It seems to me that there appears to be a political battle under way in Garrett County between Mountain Lake and the county government, and Mountain Lake is using annexation of the disputed areas as a weapon in that battle. Presumably, Mountain Lake could, eventually, under its theory, continue to annex into the county until all of the county not already in municipalities would become Mountain Lake. In that way, it could become the government. In any event, to use annexation to overrule county government policies and in the process try to stymie another town's annexation, seems to me another reason that the "prior jurisdiction rule" should be adopted in Maryland.

Oakland wanted to remain un-annexed they would have to obtain the signatures of only twenty-five percent of the voting residents of that small area to generate an election where they could work to defeat the annexation. When Mountain Lake subsequently commenced its annexation effort, which included the same land that Oakland was annexing, the residents of the original area of the Oakland annexation would have to generate another additional separate petition, this one containing at least twenty-five percent of the voting residents of the 509 + acre tract in order for the residents of the 45+ acre tract to be able to generate a separate referendum election on that annexation. The two annexation petitions would, under the Maryland statutes, be required to be presented to two different municipalities for separate verifications. If verified, the residents of the area of the original annexation effort (Oakland's 45+ acres) would have to fight two election battles to remain free of annexation. If Loch Lynn Heights had done the same thing to forestall Mountain Lake's annexation that Mountain Lake did to forestall Oakland's, the residents of the initial tract might have had to mount three simultaneous, but entirely different, battles in order to remain free from annexation.

The "prior jurisdiction rule" would prevent the imposition of such potentially onerous burdens on residents of unincorporated areas. With the annexation statutes clearly designed for orderly process, I believe the adoption of such a rule would be clearly within the contemplation of the statutes' purposes.

It certainly can be argued that if the Legislature wanted the "prior jurisdiction rule" to be applied it would have included it in the statute. And it could have. But that argument to some extent begs the question. Generally, the "prior jurisdiction rule" is a creature of the common law not statute law.

For the most part, the states that have already adopted the rule initially did so not by statute, but by case law. In respect to the state courts that have been presented with the issue, I have found only one that has categorically rejected it—Mississippi, which only recently rejected it after having previously

adopted it.[7] However, in Mississippi, annexation statutes now require as an automatic part of the process, that annexation petitions be presented to courts and that the courts are to determine the reasonableness of such annexation efforts in every case, whether contested or not. In that context, in a case involving competing annexations, the court ruled that the courts had the duty to determine the reasonableness of competing annexations and had the power to apportion boundaries of annexed areas between competing annexations. In the process the Mississippi court abandoned its previous acceptance of the "prior jurisdiction rule." *See In re Enlargement and Extension of the Mun. Boundaries of the City of D'Iberville,* 867 So.2d 241 (Miss.2004). There is no equivalent statute in Maryland, and the fixing of boundaries of annexed areas is determined in this State by the area described in the petition. While courts can determine whether the process was accomplished properly, there is no statute or case law that permits courts to independently establish boundaries of annexations when there are competing cities.

The majority rule in this country is that the common law "prior jurisdiction rule" applies when there are competing annexations.

In *City of St. Joseph v. Village of Country Club,* 163 S.W.3d 905, 907 (Mo.2005) the Missouri Supreme Court noted:

> "At issue is which of two municipalities has jurisdiction to proceed with the annexation. The issue is determined by application of the common law doctrine of 'prior jurisdiction.' The doctrine of prior jurisdiction has long been established in Missouri. It provides that, as between two municipalities competing for the same territory, the one undertaking the first 'valid step' toward annexation has priority. This Court described the doctrine in ... as follows: The prior jurisdiction doctrine resulted from the sound recognition that there cannot be two municipal corpo-

---

**7.** In *City of Muscatine v. Waters,* 251 N.W.2d 544 (Iowa 1977), the Supreme Court of Iowa adopted the "prior jurisdiction rule." A recent statute may have effectively overruled that case.

rations with co-extensive powers of government extending over the same area.... [T]he one which takes the *first valid step* to establish the consolidation or annexation has the superior claim regardless of which one completes its proceedings first." (Citations omitted.)

*See also, Town of Spencer v. Town of East Spencer,* 351 N.C. 124, 127–28, 522 S.E.2d 297, 300–301 (1999) where that Court stated:

"... [P]recedent established by this Court that annexation resolutions of intent are not so ephemeral as a proposed ordinance, since they have substantive legal effect by conclusively determining prior jurisdiction.... [P]rior jurisdiction to annex territory is determined as of the date of the adoption of a valid resolution of intent.

. . .

" '[T]he prior jurisdiction rule is the majority rule and is applied "universally" in "conflicts between two municipalities attempting to assert jurisdiction over the same territory." ' ... Under the rule, annexation proceedings begin when a municipality takes ' "the first mandatory public procedural step in the statutory process" ' ..." (Citations omitted.)

*Accord: Amrep Southwest, Inc. v. Town of Bernalillo,* 113 N.M. 19, 21–22, 821 P.2d 357, 359–60 (1991) ("To be sure, in at least one decision the doctrine was supported by a statutory codification. The California statute, however, merely codified the common-law rule previously recognized in California, and the commentators appear to be unanimous in stating that the common-law rule applies to annexation proceedings.") (citations omitted). The prior jurisdiction rule was also applied in the case of *Town of Greenfield v. City of Milwaukee,* 259 Wis. 77, 47 N.W.2d 292 (1951) which involved two municipalities fighting over annexation of an area in a third municipality. The prior jurisdiction rule had first been adopted in Wisconsin in the case of *Village of Brown Deer v. Milwaukee,* 274 Wis. 50, 79 N.W.2d 340 (1956). The doctrine was also described as

having been adopted by the Arizona Courts in *McCune v. City of Phoenix,* 83 Ariz. 98, 317 P.2d 537 (1957), discussing a dispute between the Arizona cities of Phoenix and Scottsdale over their conflicting attempts to annex the same area. Also holding that the doctrine applies were the supreme courts of Arkansas (*City of Gosnell v. City of Blytheville,* 272 Ark. 218, 613 S.W.2d 91 (1981)), North Dakota (*City of West Fargo v. City of Fargo,* 251 N.W.2d 918 (N.D.1977)), Indiana (*Taylor v. City of Fort Wayne,* 47 Ind. 274, (1874)), and Iowa (*Independent Dist. of Sheldon v. Bd. of Supervisors of Sioux County,* 51 Iowa 658, 2 N.W. 590 (1879)). Also holding that the doctrine applies in their states were the intermediate appellate courts in Kentucky (*City of Covington v. Beck,* 586 S.W.2d 284 (Ky.App.1979)) and Florida (*City of Daytona Beach v. City of Port Orange,* 165 So.2d 768 (Fla.Dist.Ct.App.1964)).

The California intermediate appellate court case of *People ex. rel. Forde v. Town of Corte Madera,* 115 Cal.App.2d 32, 34–38, 251 P.2d 988, 989–91 (1952) involved a factual situation similar to that of the present case:

"It appears that the town of Larkspur, which on its southerly and easterly boundaries abuts Corte Madera, annexed some land adjoining that annexed by Corte Madera, and including the strip on which Fordes' property is located. The basic question presented is whether the Corte Madera or the Larkspur annexation shall prevail. . . .

. . .

The rule conferring priority on the first city to file is part of the public policy of the state. It was the rule at common law. . . . The court held that section 7 of the Annexation Act . . ., conferring priority as between two conflicting annexation proceedings on the first to be instituted was declaratory of existing common law. . . . Thus, at common law, and pursuant to a consistent statutory scheme, priority is granted to that city first instituting proceedings." (Citations omitted.)

*Accord: In re Petition to Annex Certain Property to the City of Wood Dale,* 244 Ill.App.3d 820, 827, 183 Ill.Dec. 343, 349, 611 N.E.2d 606, 612 (1993) ("The general rule governing conflicting petitions ... is that the first to initiate an annexation is entitled to priority.... [P]riority ... is not dependent on the correctness or validity of the annexing petitions."); *Vill. of Creedmoor v. Frost Nat'l Bank,* 808 S.W.2d 617, 618 (Tex.App.1991) ("The principle of first-in-time is still important in municipal law.").

There is another reason that I believe makes it imperative that we directly resolve this issue. In its brief, when addressing the issue of time computation, the respondent indirectly indicated a problem that may exist because we have failed to address the issue of the "prior jurisdiction rule." Under the circumstances of this case, we tacitly will be approving a "first to finish rule." Respondent states in its brief:

> "This argument is significant because in the event the Court concludes that the Oakland hearing was held in a timely manner, the effective date [the finishing date] of the Oakland Annexation would be June 8, 2004, three days later than the date that Mountain Lake claims is the effective date of its annexation resolution. Article 23A, § 19(m) prohibits a municipality from annexing land already incorporated in another municipality. *Therefore, the town whose annexation is **determined to be effective first**, will have successfully annexed the property which both municipalities are attempting to annex in common.*
>
> ...
>
> "[W]hen the Mountain Lake Park annexation resolution became effective, the Oakland annexation either was void or was not yet effective." [Emphasis added.] [Footnote omitted.]

In effect, by failing to address the issue of the "prior jurisdiction rule" where a party is asserting that the "first to finish" controls, we are indirectly rejecting the "prior jurisdiction rule" and risk having a "first to finish" rule become the

law in this State. By not expressly rejecting the "first to finish" position, as I believe we should, we send, in my view, an inappropriate message to the State's municipalities that potentially opens up the State to an annexation free-for-all.

I respectfully suggest that we should follow the lead of the vast majority of states that have addressed the issue and adopt as part of the common law, the "prior jurisdiction rule" in the present case. I also suggest that in light of the Court's failure to adopt the Rule, that the matter be brought to the attention of the Legislature for its consideration.